

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

## NO. AP-76,452

### GARLAND B. HARPER, Appellant

### v.

### THE STATE OF TEXAS, Appellee

### ON DIRECT APPEAL
### FROM THE 182ND JUDICIAL DISTRICT COURT,
### HARRIS COUNTY

*Womack, J., delivered the opinion for a unanimous Court.*

A jury convicted the appellant of capital murder for killing three people during one criminal transaction.[1] Pursuant to the jury's answers to the special issues, the trial court sentenced the appellant to death.[2] Appeal to this court was automatic.[3] The appellant raises eight issues;

---

[1] *See* TEX. PENAL CODE § 19.03(a)(7)(A).

[2] *See* TEX. CODE CRIM. PROC. art. 37.071, § 2(g).

[3] *See* TEX. CODE CRIM. PROC. art. 37.071, § 2(h).

finding no error, we affirm.

## I. Background

The appellant and Triska Rose began dating in the spring of 2008. Their relationship progressed quickly, and the appellant moved in with Rose and her two daughters: Mya, aged seven, and Briana, aged sixteen. The couple's relationship soon deteriorated as the appellant became convinced that Rose was having an affair. (It was undisputed at trial that Rose was not having an affair.) The appellant began following her, calling her obsessively, and dropping by her place of employment without warning.

On the evening of October 23, 2008, the appellant told Rose that he wanted to have sex. Rose responded that she was tired, which the appellant took as further evidence of her infidelities. Rose told him that she was sick of his accusations and wanted to end things. This led to a fight in which Rose and Briana were somehow cut with a knife. Believing that he would go to jail for domestic violence if the police were called, the appellant bound and gagged Rose and the girls. He questioned them one at a time in order to "get to the bottom of this." After several hours, Mya "admitted" that Rose had been cheating on him. This sent him into a jealous rage, he later claimed. He stabbed Rose repeatedly and then strangled Briana with his hands, telling her that she should not have sided with her mother. Finally, he strangled Mya with a phone charger. Afterwards he went out "to think." When he returned he thought that Briana and Rose still might be alive, so he slit their throats.

After the appellant cleaned up, he visited some friends. Later that morning, he called Chandra Parson, a friend of the family, to say that Mya was ill and would not be coming over before school as she usually did. When Parson asked about Rose, the appellant hung up. After

learning that Rose was not at work and Briana was not at school, Parson became worried. She went by the apartment, called repeatedly, and filed a missing-person report with the police. Finally, late in the afternoon, Parson and some other friends decided to enter Rose's apartment.

The friends broke in through the back door and found Rose, Briana, and Mya dead in the master bedroom. All three were tied up. An autopsy showed that Rose was stabbed approximately thirty-six times: her throat was slit, she had defensive wounds on her hands and arms, cuts on her chest, stomach, and face. Briana died from strangulation, but she also had cuts on her neck and chest, and three of her fingernails were broken. Mya had been strangled with the cord of a phone charger. The medical examiner said that it would have taken about three minutes for the children to die from asphyxiation.

While the police were processing the crime scene, the appellant approached and said he wanted to turn himself in. At the police station, the appellant confessed to the murders.

## II. Future Dangerousness

In the appellant's first point of error, he argues that the evidence at trial was legally insufficient to support the jury's finding of a probability that he would commit future criminal acts of violence which would constitute a continuing threat to society.[4] Finding ample evidence to support the jury's verdict, we overrule this point of error.

We assess the sufficiency of future-dangerousness evidence in the light most favorable to the jury's findings.[5] We must determine whether any rational trier of fact could have found a

---

[4] *See* TEX. CODE CRIM. PROC. art. 37.071, § 2(b)(1).

[5] *Coble v. State*, 330 S.W.3d 253, 265 (Tex. Cr. App. 2010) (*citing Berry v. State*, 233 S.W.3d 847, 860 (Tex. Cr. App. 2007)) .

probability that the defendant would commit future criminal acts of violence which would constitute a continuing threat to society, and we will reverse only if a rational jury would necessarily have had a reasonable doubt about this probability.[6]

The special issue asks if "a defendant would constitute a continuing threat whether in or out of prison without regard to how long the defendant would actually spend in prison if sentenced to life."[7] In other words, the issue concentrates on "the character for violence of the particular individual, not merely the quantity or quality of the institutional restraints put on that person."[8] Some factors a jury may consider in determining future dangerousness include:

> 1. the circumstances of the capital offense, including the defendant's state of mind and whether he or she was working alone or with other parties; 2. the calculated nature of the defendant's acts; 3. the forethought and deliberateness exhibited by the crime's execution; 4. the existence of a prior criminal record, and the severity of the prior crimes; 5. the defendant's age and personal circumstances at the time of the offense; 6. whether the defendant was acting under duress or the domination of another at the time of the commission of the offense; 7. psychiatric evidence; and 8. character evidence.[9]

This list is not exhaustive. The jury is entitled to consider all the evidence at both the guilt and punishment stages of trial.[10]

---

[6] *Id.*

[7] *Estrada v. State*, 313 S.W.3d 274, 281 (Tex. Cr. App. 2010). The appellant urges this court to abandon precedent and evaluate future dangerousness solely in terms of his likelihood to commit a crime within prison, stressing his mostly non-violent record while incarcerated. We decline to do this. *See Coble,* 313 S.W.3d, at 269 ("It is theoretically possible to devise a prison environment so confining, isolated, and highly structured that virtually no one could have the opportunity to commit an act of violence, but incapacitation is not the sole focus of the Legislature or of our death penalty precedents.").

[8] *Coble*, 313 S.W.3d, at 268.

[9] *Keeton v. State*, 724 S.W.2d 58, 61 (Tex. Cr. App. 1987). *Accord, Coble*, 330 S.W.3d, at 269, n.24. (This list does not include characteristics of the prison system.).

[10] TEX. CODE CRIM. PROC. art. 37.071, § 2(d)(1).

The circumstances of the offense and the events surrounding it can be sufficient to sustain a "yes" answer when the crime is "so heinous as to display a wanton and callous disregard for human life."[11] This was such a crime. After stalking Rose for a month or more, the appellant stabbed her at least 36 times while her children were restrained nearby. The appellant then stabbed Briana repeatedly, slit her throat, and strangled her for three minutes. Finally, the appellant strangled Mya with a phone charger. This "infliction of multiple wounds at close range indicates a wanton and callous disregard for human life"[12] and is legally sufficient to support the jury's finding.

Further, the jury could find that the appellant would commit future acts of violence because of his criminal history, which spans more than two decades.[13] The appellant's prior criminal acts of violence were severe and unpredictable, occurring after periods of nonviolence and apparent repentance. His victims included intimate partners and complete strangers. There was no evidence that his violent tendencies would change.

The evidence was legally sufficient to support a finding that the appellant would constitute a future danger to society, whether in or out of prison. The appellant's first point of error is overruled.

---

[11] *Dinkins v. State,* 894 S.W.2d 330, 358 (Tex. Cr. App. 1995) (Evidence of the premeditated and brutal murders of two women, including multiple gunshot wounds at close range, was sufficient to support an affirmative answer to the future dangerousness special issue. "Character evidence uniformly favorable to" the defendant was alone insufficient to mitigate the premeditation and brutality of the offense.); *see also Fuller v. State*, 253 S.W.3d 220, 231-32 (Tex. Cr. App. 2008)(An unprovoked nighttime attack against a family in which the parents were killed and the children nearly killed was sufficient to sustain a future dangerousness finding.).

[12] *Dinkins,* 894 S.W.2d, at 360.

[13] *See Martinez v. State,* 327 S.W.3d 727, 735 (Tex. Cr. App. 2010).

III. *Batson* Challenge

The appellant next argues that the State exercised a peremptory challenge in violation of the Equal Protection Clause of the United States Constitution.[14] Finding no reversible error, we overrule the appellant's second issue.[15]

In *Batson v. Kentucky*, the United States Supreme Court held that "the Equal Protection Clause forbids the prosecutor to challenge potential jurors solely on account of their race ...."[16] The Supreme Court set out the procedure for bringing a *Batson* objection in *Purkett v. Elem*:

> Under our *Batson* jurisprudence, once the opponent of a peremptory challenge has made out a *prima facie* case of racial discrimination (step one), the burden of production shifts to the proponent of the strike to come forward with a race-neutral explanation (step two). If a race-neutral explanation is tendered, the trial court must then decide (step three) whether the opponent of the strike has proved purposeful racial discrimination.[17]

The ultimate burden of persuasion rests with the opponent of the strike (here the appellant) to establish by a preponderance of the evidence that the strike was the product of the proponent's purposeful discrimination.[18]

The appellant's only evidence of discrimination is the similarity of the challenged venire-member's "jury questionnaire evaluation score" and those of the accepted members. He does not explain what this score represents or why it should be more important than the venire-members'

---

[14] *See* U.S. CONST. amend. XIV, § 1.

[15] *Snyder v. Louisiana*, 552 U.S. 472, 477 (2008) (Deferential review is necessary for *Batson* challenges because the trial judge is better able to evaluate the striking attorney's credibility.); *see also Gibson v. State*, 144 S.W.3d 530, 533-34 (Tex. Cr. App. 2004).

[16] 476 U.S. 79, 89 (1986).

[17] 514 U.S. 765, 767 (1995).

[18] *Watkins v. State*, 245 S.W.3d 444, 447 (Tex. Cr. App. 2008).

oral statements. The appellant also failed to preserve the jury questionnaires (on which he seems to rely) which would tell us the racial composition of the venire and the racial composition of the seated jury.[19]

The State argues (and the record reflects) that the challenged venire-member gave long-winded and non-committal answers to some questions while appearing opposed to the death penalty during others. At one point she stated, "I'm pretty settled …. I don't like to see people die." Further, she expressed a strong belief in rehabilitation and the desirability of forgiveness. These are race-neutral reasons for a peremptory challenge.

The appellant has not met his burden. The trial court accepted the State's many race-neutral explanations for its peremptory challenge. On the record before us, we cannot say that this decision was clearly erroneous.

## IV. The Appellant's Statement

In points of error three, four, and five, the appellant challenges the trial court's admission of a statement he made to police. Because his arguments do not comport with those made at trial, they were not properly preserved and are overruled.

To be preserved for appellate review, a specific and timely complaint must have been made on the record and ruled on by the trial judge.[20] The specificity requirement is met if the complaint made at trial was clear enough for the trial judge to understand what the complaining

---

[19] The appellant made a record of the fact that when the State struck the contested venire-member, it had used half of its exercised-peremptory strikes against African-Americans. The record does not reflect the racial composition of the six accepted members (the races of two were not read into the record), the reasons for the other strikes against African-Americans, or the racial breakdown of the later seated jurors.

[20] TEX. R. APP. P. 33.1.

party wanted, why they were entitled to it, and to take corrective action.[21] We will not address an objection on appeal if it varies from the objection raised at trial.[22]

Before trial, the appellant filed six motions to suppress oral statements. Most were global and did not specifically identify the basis for the challenge or even which statement was being contested.[23] Nonetheless, the trial court held a hearing outside the presence of the jury to determine the admissibility of the statement. At that hearing, the appellant's trial counsel argued that the statement was inadmissible because it did not comply with the general requirements for custodial interrogations. His entire argument read:

> Judge, I'm taking the position that none of the statement is admissible pursuant to Article 38.22 [of the Texas Code of Criminal Procedure]. It's an oral statement. My reading of *Herrera*[24] is whether or not the accused felt like he was being restrained or detained for purpose of the question on the case *[sic]*. My client stated there was a guard outside the door. He felt like he had to obey the command to talk with the officers. He was being restrained for the purpose of this interrogation and I would agree that he was given his *Miranda*[25] warning as required but, again, it does not satisfy the mandates of 38.22 and I'd request that the statement in total be suppressed.

Now, before this court, the appellant abandons the custody claim and argues that the trial

---

[21] *Lovill v. State*, 319 S.W.3d 687, 691 (Tex. Cr. App. 2009); *Pena v. State*, 285 S.W.3d 459, 464 (Tex. Cr. App. 2009).

[22] *Lovill,* 319 S.W.3d, at 691; *Euziere v. State*, 648 S.W.2d 700, 703-04 (Tex. Cr. App. 1983).

[23] Only two motions identified by date the statement which the appellant sought to exclude, and they did not refer to the one questioned on appeal. None were ruled on. *See* TEX. R. APP. P. 33.1 (Complaints on appeal must have "sufficient specificity to make the trial court aware of the complaint" and must be ruled upon.); *Swain v. State*, 181 S.W.3d 359, 365 (Tex. Cr. App. 2005) ("Global" motions containing little more than citations to constitutional and statutory provisions are insufficient to preserve error on appeal.).

[24] *Herrera v. State,* 241 S.W.3d 520 (Tex. Cr. App. 2007) (Jail inmate did not meet his burden of showing he was "in custody" for purposes of *Miranda* and Texas Code of Criminal Procedure article 38.22 when questioned about an incident unrelated to the crime for which he was imprisoned.).

[25] *Miranda v. Arizona,* 384 U.S. 436 (1966).

court erred in admitting his statement because it was coerced. Specifically, he claims that he did not voluntarily waive his right not to engage in self incrimination under the Fifth Amendment to the United States Constitution and that this made the statement inadmissible under articles 38.21,[26] 38.22 § 5,[27] and 38.23(a)[28] of the Texas Code of Criminal Procedure.

Although both the appellant's argument at trial and his brief on appeal cite to article 38.22, they are not the same complaint. At trial, he argued only that the appellant was in custody, and thus subject to the full protection of the statute. The only case discussed focused solely on that issue. On appeal, the appellant argues that because he felt he could suffer a loss for failing to answer questions, the statement was involuntary under federal law and inadmissible under both Texas and federal law. Consequently, the appellant's appellate points were not properly preserved. Points of error three, four, and five are overruled.

## V. Violation of "the Rule"

In the appellant's final three points of error, he argues that the trial court erred by allowing the State's rebuttal witness to testify despite having been present in the courtroom in

---

[26] TEX. CODE CRIM. PROC. art 38.21 ("A statement of an accused may be used in evidence against him if it appears that the same was freely and voluntarily made without compulsion or persuasion, under the rules hereafter prescribed.").

[27] TEX. CODE CRIM. PROC. art 38.22, § 5 ("Nothing in this article precludes the admission of a statement made by the accused in open court at his trial, before a grand jury, or at an examining trial in compliance with Articles 16.03 and 16.04 of this code, or of a statement that is the *res gestae* of the arrest or of the offense, or of a statement that does not stem from custodial interrogation, or of a voluntary statement, whether or not the result of custodial interrogation, that has a bearing upon the credibility of the accused as a witness, or of any other statement that may be admissible under law.") The appellant does not make clear how this statute relates to his claim.

[28] TEX. CODE CRIM. PROC. art 38.23(a) ("No evidence obtained by an officer or other person in violation of any provisions of the Constitution or laws of the State of Texas, or of the Constitution or laws of the United States of America, shall be admitted in evidence against the accused on the trial of any criminal case. In any case where the legal evidence raises an issue hereunder, the jury shall be instructed that if it believes, or has a reasonable doubt, that the evidence was obtained in violation of the provisions of this Article, then and in such event, the jury shall disregard any such evidence so obtained.").

violation of Texas Rule of Evidence 614 ("the Rule").[29] These points of error were not properly preserved.

Texas Rule of Appellate Procedure 33.1 requires that complaints at trial be timely made in order to be properly preserved for appeal.[30] The rationale of Rule 33.1 is that if objections are raised before the trial court as soon as error becomes foreseeable, they may be addressed and the error possibly corrected or avoided.[31] This ensures that litigants and the judicial system are not burdened by appeal and retrial. When a party is excused from the requirement of objecting, the results are the opposite.[32] The requirement of a proper objection extends to most types of errors, including evidentiary mistakes, the denial of due process, and prosecutorial misconduct.[33]

In the instant case, the appellant invoked the Rule at the beginning of his trial. Before the punishment hearing began on October 8, 2010, the court inquired if there were any witnesses in the courtroom who needed to be placed under the Rule. Both parties answered that there were not. The first witness on October 13, 2010, was the defense's expert, Dr. Richard Dudley. During his testimony, Dr. Dudley discussed a report prepared by Dr. Moellar, the State's expert.[34] The appellant then offered into evidence, without objection, the hearsay report. During his testimony, Dr. Dudley discussed parts of Dr. Moellar's report that were especially harmful to the State's

---

[29] TEX. R. EVID. 614 ("At the request of a party the court shall order witnesses excluded so that they cannot hear the testimony of other witnesses, and it may make the order of its own motion...").

[30] TEX. R. APP. P. 33.1.

[31] *Moore v. State*, 295 S.W.3d 329, 333 (Tex. Cr. App. 2009).

[32] *Young v. State*, 137 S.W.3d 65, 69 (Tex. Cr. App. 2004).

[33] *Clark v. State*, 365 S.W.3d 333, 339 (Tex. Cr. App. 2012).

[34] The appellant had been served with notice that the State intended to call Dr. Moellar as a witness.

case. He also disagreed with Dr. Moellar's diagnosis of the appellant and opined that the appellant was not exaggerating or attempting to mislead anyone about his mental-health problems.

Over the course of the morning's testimony, the appellant's trial counsel noticed a man passing notes to the prosecutors. At a midday break, trial counsel approached this man, introduced himself, and inquired if he was Dr. Moellar. The man responded that he was. The appellant's counsel did nothing with this information and resumed his examination of Dr. Dudley. After the defense rested at the end of the next day, the State notified the court that it wished to call Dr. Moellar as a rebuttal witness. Only then, after not objecting to Dr. Moellar's presence in the courtroom for a full day and a half, did the appellant object that his testifying would violate the Rule.

During a discussion at the bench, the appellant's trial counsel conceded that he knew Dr. Moeller was in the courtroom, but he said he had assumed Dr. Moeller would not be testifying. The following exchange occurred:

> The court: [The defense] knew who [Dr. Moeller] was because [they] referred to him during Dr. Dudley's testimony.
> Defense counsel: But it's not our job. He wasn't excused from the Rule.

At the hearing, it was uncontested that local practice often allowed experts to listen to each other testify. After Dr. Dudley finished testifying, Dr. Moeller heard the testimony of three lay witnesses. The Court allowed Dr. Moeller to testify despite acknowledging the Rule had been violated.

We hold that objecting was indeed counsel's job. Having been served with a witness list

which named Dr. Moeller as a testifying expert,[35] the appellant was on notice that a possible error was occurring as soon as he discovered Dr. Moeller's presence. Had the appellant objected at that point, when Dr. Moeller had heard only part of Dr. Dudley's testimony, the trial court could have ruled on whether or not Dr. Moeller was essential to the State's case or instructed him to wait outside. By failing to object, the appellant slept on his rights and prevented the system's curative process. Points of error six, seven, and eight are overruled as untimely and not preserved.

The trial court's judgment is affirmed.

Delivered October 10, 2012.
Do not publish.

---

[35] *Pope v. State*, 207 S.W.3d 352, 360 (Tex. Cr. App. 2006) ("[O]nce a party designates a particular person as an expert that he may use as a witness at trial, that person is no longer a 'consulting' expert, he is a 'testifying' expert[.]").